## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

EDWIN W. BOWERMAN,        §
       §
       Plaintiff,        §
       §
vs.        §        CIVIL ACTION NO. H-07-1925
       §
MICHAEL ASTRUE, Commissioner        §
of Social Security,        §
       §
       Defendant.        §

## MEMORANDUM AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for summary judgment have been filed by Plaintiff Edwin W. Bowerman ("Plaintiff," "Bowerman") and Defendant Michael Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #15; Defendant's Cross-Motion for Summary Judgment, Docket Entry #11; Brief in Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #12). Each party has also filed a response to the competing motions. (Plaintiff's Reply to Defendant Commissioner's Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry #16; Defendant's Reply Brief in Opposition to Plaintiff's Cross-Motion for Summary Judgment ["Defendant's Response"], Docket Entry # 17). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Defendant's motion be GRANTED, and that Plaintiff's motion be DENIED.

**Background**

On June 7, 2002, Plaintiff Edwin Bowerman filed an application for Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"). (Transcript ["Tr."] at 55). In that application, Bowerman claimed that he had been unable to work since July 12, 2001, as a result of "low back pain." (Tr. at 55, 70). The SSA denied his application on September 12, 2002, finding that he was not disabled. (Tr. at 26-30). Bowerman did not appeal that denial. Instead, on May 15, 2003, he filed another application for DIB, claiming that he has been disabled since July 12, 2001, due to lower back pain and a "lumbar sprain." (Tr. at 58, 61, 64, 70). On July 24, 2003, the SSA denied the application, after concluding that Bowerman is not disabled under the Act. (Tr. at 31-35). On September 26, 2003, Plaintiff filed a request for reconsideration. (Tr. at 36). The SSA reopened his case to consider additional information, but ultimately concluded that he is not disabled because his "condition is not expected to remain severe enough for 12 months in a row." (Tr. at 38-41).

On January 6, 2004, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. at 42). That hearing, before ALJ Richard Abrams, took place on January 7, 2005. (Tr. at 16, 273). Plaintiff appeared with his representative, Ellen Usher, and he testified in his own behalf. (Tr. at 16). The ALJ also heard testimony from Dr. Gretha Wik, a specialist in occupational medicine, and from Karen Nielson ("Ms. Nielson"), a vocational expert witness. (Tr. at 16, 47).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.   An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.   20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.   An individual who does not have a "severe impairment" will not be found to

be disabled.  20 C.F.R. §§ 404.1520©) and 416.920©).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.    If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well-settled that, under this analysis, Bowerman has the burden to prove any disability that is relevant to the first four steps. *See Wren*, 925 F.2d at 125.  If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).   Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452.   A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "[he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy."   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as on his review of the evidence, the ALJ determined that Bowerman has "lumbar dis[k] disease." (Tr. at 18).  Although he found that this impairment, alone and in combination with others, is severe, he concluded, ultimately, that it does not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.  (Tr. at 18-21).  The ALJ also determined that Bowerman was unable to perform his past relevant work as a machinist and that his "acquired job skills do not transfer to other occupations" within his residual functional capacity ("RFC").  (Tr. at 20-21).  However, he found that Bowerman does have the RFC to perform other work that is available in the national economy, including work as a "final inspector," a "laminator II," and  a "final assembler."  (Tr. at 21).  For these reasons, he concluded that Bowerman "has not been under a 'disability,' as defined in the Social Security Act, from July 21, 2001[,] through the date of this decision."  (Tr. at 21).  With that, he denied Bowerman's application for disability benefits.  (Tr. at 22).

On December 1, 2006, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 7-9).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  On March 30, 2007, the Appeals Council denied Plaintiff's request, finding that no applicable reason for review existed.  (Tr. at 4-6).  With that ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On June 7, 2007, Bowerman filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Plaintiff's Complaint ["Complaint"], Docket Entry #1).  Having considered the pleadings, the evidence submitted, and the applicable law, it is recommended that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied.  *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.* (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance."  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains

substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her pain; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

**Discussion**

Before this court, Plaintiff challenges the ALJ's finding that he is not disabled under the Act. (Plaintiff's Motion at 6). In making that argument, he claims that the ALJ failed to give the correct weight to the medical opinions of his treating physicians. (*Id.*; Plaintiff's Response at 2-3). He also complains that Dr. Wik, the medical expert upon whom the ALJ did rely, based her conclusions on medical records outside the relevant time period. (*Id.*). Further, in response to Defendant's arguments, Plaintiff states that it is inappropriate for the Commissioner and, presumably, the court, to consider evidence that the ALJ did not specifically reference in his decision, even if that evidence was in the record at the time of the decision. (Plaintiff's Response at 2). Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Bowerman is not disabled. (Defendant's Motion at 2-11).

### *Medical Facts, Opinions, and Diagnoses*

Medical records are available from as early as July 28, 1998, when Bowerman was examined by Dr. Dilipkuma Patel ("Dr. Patel"), an internist. (Tr. at 179). None of the appointments prior to

October, 2000, however, relate to the aliments that are at issue in Plaintiff's DIB claim.[1]  On October 16, 2000, Bowerman complained of muscle spasms in his back and of "shaking hands."  (Tr. at 159).  It is unclear whether he was treated for these conditions.  However, on December 18, 2000, Dr. Patel ordered lab tests and a two x-ray view of Bowerman's cervical and lumbar spine.  (Tr. at 154-55, 158).  The x-rays of the cervical spine revealed that the C5-6 and C6-7 interspaces were narrowed and that mild spondylosis[2] was present at C6-7.  (Tr. at 154).  Lumbar spine x-rays showed disk narrowing and mild spondylosis at L5-S1, and the L4-5 interspace was found to be narrowed.  (*Id.*).  The radiologist found that Bowerman had "degenerative dis[k][3] changes and spondylosis at the C5-6, C6-7, L5-S1, and L4-5 levels," as well as "nonspecific sclerotic focus" in the T12 vertebral body.  (*Id.*).  Bowerman visited Dr. Patel twice more, for follow-up examinations and, because he was suffering from headaches.  (Tr. at 152-53).  On July 17, 2001, Bowerman returned to Dr. Patel complaining of back pain, and the doctor ordered MRIs of the lumbar spine and the dorsal spine.  (Tr. at 148-51).  The MRI of the dorsal spine revealed that there was "no cord compression, syrinx or myelomalacia[4]"; that the cord signal was normal; that the "vertebral body heights [were] maintained"; and that the "bone marrow signal is normal."  (Tr. at 148).  The MRI of the lumbar spine showed "dis[k] desiccation[5] . . . at L5-S1 level as well as narrowing of dis[k] space."  (Tr. at

---

[1]  These included cold and upper-respiratory infections.  (*See* Tr. at 160, 162, 165-66, 168-74, 176-77, 179).

[2]  "Spondylosis" is "a condition of the spine characterized by fixation or stiffness of a vertebral joint." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 1528 (5th ed. 1998).

[3]  A "degenerative" disk is "the gradual deterioration of normal cells and body functions" regarding or "involving degeneration or change to a lower or dysfunctional form of an intervertebral dis[k]."  *Id.* at 453.

[4]  "Myelomalacia" is "an abnormal softening of the spinal cord."  *Id.* at 1070.

[5]  Disk "dessiccation" is the drying of the intervertebral disk.  *Id.* at 472.

150).  Additionally, there was "no dis[k] herniation[6], canal stenosis[7] or foraminal[8] narrowing" noted.

(*Id*.).  The next day, Bowerman returned to Dr. Patel's office, again complaining of muscle spasms.

(Tr. at 147).  It appears that he was treated with medication on that date.  (*Id*.).  Plaintiff continued

to see Dr. Patel for apparent follow up visits in August and September, 2001.[9]  (Tr. at 138-46).

The next record, dated September 26, 2001, is from Dr. Ricardo Pardo ("Dr. Pardo"), a

neurologist.  (Tr. at 206-09).  In his report, Dr. Pardo concluded that Bowerman suffered from "Left

L 4 radiculopathy."[10]  (*Id*.).

In October, 2001, Bowerman was treated by Dr. Michelle Fredricks ("Dr. Fredricks"), a

family practitioner.  (Tr. at 181-83, 199-209).  On October 10, 2001, Dr. Fredricks ordered an MRI

of Plaintiff's lumbar spine.  (Tr. at 183, 204).  That MRI showed that, at the L5-S1 level, Bowerman

suffered from disk desiccation with "moderate to marked loss of dis[k] height, and moderate bony

spondylosis."  (*Id*.).  However, "no lateralizing dis[k] herniation [was] seen."  (*Id*.).  The MRI also

showed "moderate neural foraminal narrowing"and a "significant inflammatory type signal in the

L5 and S1 endplates (Modic Type I)."  (*Id*.).  In addition, the MRI showed disk desiccation with

"mild loss of dis[k] height and mild posterior dis[k] bulging" at the L4-5 level.  (*Id*.).  Further, at the

L3-4, L2-3, L1-2, and T12-L1 levels, the test results showed "central dis[k] desiccation," but no

other abnormality.  (*Id*.).  Finally, the bone marrow was shown to be homogeneous with the

---

[6]  A "herniated disk" is "a rupture of the fibrocartilage surrounding an intervertebral disk, releasing the nucleus pulposus that cushions the vertebrae above and below.  The resultant pressure on spinal nerve roots may cause considerable pain and damage the nerves."  *Id.* at 756.

[7]  Canal stenosis is "an abnormal condition characterized by the constriction or narrowing" of the spinal canal.  *Id.* at 1539.

[8]  A "foramen" is "an opening in a membranous structure or bone."  *Id.* at 652.

[9]  Unfortunately, many of Dr. Patel's records are difficult to read.  (*See* Tr. at 138-46).

[10]  "Radiculopathy" is "a disease involving a spinal nerve root."  Mosby's at 1377.

8

exception of "fairly extensive inflammatory type change at the L5 and S1 endplates posteriorly." (*Id*.).  This MRI was then compared to the MRI previously performed on July 26, 2001, and "no significant change" was discovered.  (*Id*.).  On November 26, 2001,in response to his complaints of pain, Dr. Fredricks gave Bowerman an epidural steroid injection.  (Tr. at 182, 203).  Eleven days later, Bowerman returned for a second injection, reporting that the relief he obtained from the first one faded after a couple of days.  (Tr. at 181, 201).

The next doctor to treat Bowerman was Dr. Darrell Hanson ("Dr. Hanson"), an orthopedic surgeon.  (Tr. at 185-90).  On October 22, 2002, Dr. Hanson found that Bowerman suffered from "degenerative dis[k] disease, L4-5 and L5-S1."  (Tr. at 189).  He determined that Bowerman's medical history indicated "back problems for the last 17 months," but that his symptoms had become "much worse over the past 3-4 months."  (*Id*.).  According to Dr. Hanson, Bowerman described his pain as 75% in his back and 25% in his left leg.  (*Id*.).  He also complained that the left leg pain "radiated down the back of his thigh" but did not "go below his knee."  (*Id*.).  Dr. Hanson noted that Bowerman had a "hard time sitting or walking at all without pain."  (*Id*.).  He also found that Bowerman's prior treatments for his complaints included "physical therapy, ultrasound, and TENS unit, narcotics, and epidural steroid injections."  (*Id*.).  In addition, he noted that two neurosurgeons had recommended "2-level fusion" surgery.  (*Id*.).  Dr. Hanson's own examination revealed that Bowerman's "neck is supple and not-tender," and that his bilateral range of motion and strength in the upper extremities is good.  (*Id*.).  He noted that Bowerman had "some pain with lumbar flexion past 60°," but that his lumbar spine extension was "fairly good," with "5/5 strength" in his bilateral lower extremities.  (*Id*.).  Additionally, Dr. Hanson found that Bowerman did not suffer from sensory

deficits, nerve root tension signs, or Waddell signs.[11] (*Id.*). Dr. Hanson also reported that past x-rays and MRI images showed that Bowerman was suffering from "significant dis[k] degeneration at L5-S1" and "significant dis[k] height narrowing as well as loss of dis[k] hydration at L4-5." (*Id.*). Dr. Hanson spoke to Plaintiff about surgery, but warned that it "may or may not help him." (Tr. at 190). On October 30, 2002, Bowerman underwent a three-level lumbar discogram, which revealed "significant dis[k] space narrowing with vacuum dis[k] at L5-S1 in addition to facet arthropathy[12] at L5-S1." (Tr. at 186). The reports also show that, during the testing, "significant concordant pain was elicited." (*Id.* at 187). In his review of the procedure, Dr. Hanson stated that, at L3-4, there was normal discography without discogenic pain. (*Id.*). He also noted, however, that there was an abnormal result at both the L4-5 and L5-S1 levels. (*Id.*). At L4-5, Dr. Hanson found a "posterior annular tear," but pointed out that it appeared to cause Bowerman "only discordant pain." (*Id.*). At L5-S1, he found "diffuse fissuring" and "significant concordant pain" which he noted was "suggestive of a pressure-sensitive dis[k]." (*Id.*). On the same day, a CT scan was done, and those findings were consistent with the findings during Bowerman's discography. (Tr. at 188). On December 11, 2002, Bowerman saw Dr. Hanson for a follow up appointment. (Tr. at 185). Dr. Hanson recommended a surgical fusion at the L4-5 and L5-S1 levels, and expressed the following concerns about Bowerman's ability to perform his job:

> Because of his significant dis[k] degeneration and his severe pain, I think this does impairs [sic] him from preforming his regular occupation. At this point I would not let him lift anything really at all... I think he probably will meet the definition of disabilities because he is not able to perform the duties of his regular occupation.

---

[11] "Waddell signs" are "manifestations of pain resulting from specific maneuvers that should not induce back pain, and are used to identify patients reacting to 'psychosocial' factors, such as economic or social issues, including pending litigation." *Hilmes v. Barnhart*, 118 Fed. Appx. 56, 58 (7th Cir. 2004) (unpublished opinion); *See* Robert L. Bratton, M.D., *Assessment and Management of Acute Low Back Pain*, 60 AMERICAN FAMILY PHYSICIAN 2299-308 (November 15, 1999) *available at* www.aafp.org/afp/991115ap/2299.html; *S igns Suggestive of Nonorganic Back Pain, available at* www.neuroland.com/spin/lbp_nonorganic_sign.htm.

[12] An "arthropathy" is "an disease or abnormal condition affecting a joint." MOSBY'S at 127.

(*Id.*).

Before Bowerman agreed to the surgery, he obtained a second opinion from Dr. Peyman Pakzaban ("Dr. Pakzaban"), a neurosurgeon.  (Tr. at 192).  In his report, Dr. Pakzaban stated that Bowerman had suffered from back pain for eight months, but that the pain rarely radiated down his left leg.  (*Id.*).  He also stated that the pain Bowerman experienced is "exacerbated by prolonged sitting and standing and is relieved only when he lies on his side." (*Id.*).  Dr. Pakzaban's physical examination revealed that Bowerman had a healthy appearance, his head and neck were unremarkable, and his abdomen was "soft and nontender."  (*Id.*).  The doctor determined that Bowerman's motor strength is "full and symmetric" for both the upper and lower extremities, and that there is "no clubbing, cyanosis, or edema revealed."  (*Id.*).  Dr. Pakzaban also made the following findings:

> [Bowerman's] lumbar spine is nontender to palpation.  Straight-leg raising produces low back pain but no leg pain," [that he can bend forward to touch his shins but develops low back pain in this position, and that he can squat and stand on] his toes and heels without difficulty.

(Tr. at 193).  Dr. Pakzaban told Bowerman that a lumbar fusion should be reserved as a last resort. (*Id.*).  He concluded that Bowerman should exhaust all other means, but "if his pain is severe enough," then he should elect a lumbar fusion evaluation.  (*Id.*).  However, if "he can live with his pain, he should do so."  (*Id.*).

On September 11, 2002, Dr. Walter Buell ("Dr. Buell"), a neurologist, completed a residual functional capacity assessment of Bowerman, on behalf of the state.  (Tr. at 210-17).  Dr. Buell concluded that Bowerman could lift or carry twenty pounds occasionally; could lift or carry ten pounds frequently; could stand or walk with normal breaks for about six hours in an eight hour work day; could sit for approximately six hours in an eight hour workday with normal breaks; and that his capacity to push or pull " was unlimited, other than as shown for lift and/or carry."  (Tr. at 211). He found further that Bowerman could occasionally climb ramps or stairs, but that there were limits

11

to his ability to balance, stoop, kneel, crouch, or crawl.  (Tr. at 212).  He also noted that Bowerman

should never climb ladders, ropes, or scaffolds.  (*Id*.).  Dr. Buell also found that Bowerman does not

have any manipulative, visual, communication, or environmental limitations.  (Tr. at 213-14).  His

final impression was that Bowerman suffered from the following conditions:

> narrowing, L5-S1.  Disk bulge, L4-5.  Desiccated disk, L5-S1.  DDD, L5-S1. plus
> SLR's, 7-31-02.  L L4 radiculopathy.  Partially credible symptoms/limitations.

(Tr. at 215).

On February 17, 2003, Bowerman was admitted to The Methodist Hospital for back surgery.

(Tr. at 219-44).   This record lists both the admitting and the final diagnosis as degenerative disk

disease at L4-5 and L5-S1.   (Tr. at 219, 230, 233).   Dr. Roberto Barrios ("Dr. Barrios"), a

pathologist, found that Bowerman has "intervertebral dis[k] and anterior end-plate, L4-5, L5-S1,

discectomy — Degenerative changes."  (Tr. at 235).   He also found that the microscopic view of

Bowerman's disk and end plate anterior L4-5, L5-S1, showed the following:

> irregular fragments of fibrocartilaginous[13] tissue with inhomogeneity, fibrillation,[14]
> and chondrocyte[15] cloning.  There is also a fragment of benign attached skeletal
> muscle.  No malignancy is identified.

(*Id*.).

On July 9, 2003, Dr. Frank Barnes ("Dr. Barnes"), an orthopedic surgeon, examined

Bowerman on behalf of the state.  (Tr. at 245-46).  Dr. Barnes stated that his physical examination

revealed that Bowerman's "curvature" of the lumbar spine "is normal without list, but there is some

---

[13] Fibrocartilage is "cartilage that consists of a dense matrix of white collagenous fibers.  Fibrocarilaginous disks between the vertebrae help to cushion the jolts to which the vertebral column is continually subjected." *Id.* at 630.

[14] "Fibrillation" is the "involuntary recurrent contraction of a single muscle fiber or of an isolated bundle of nerve fibers." *Id.*

[15] A "chondrocyte" is "any one of the polymorphic cells that form the cartilage of the body." *Id*. at 327.

spasticity and rigidity." (*Id.*). He reported that Bowerman had left lumbar tenderness and some left

gluteal tenderness. (*Id.*). And he found the "Babinski's[16] is downward," and negative results for the

straight leg raising tests[17] while Plaintiff was sitting. (Tr. at 245-46). Dr. Barnes noted that supine

leg raising tests produced hip pain at 65 degrees for the left leg but no pain for the right leg, and that

Bowerman's ankle and knee reflexes are strong. (*Id.*). In addition, Dr. Barnes stated that "pelvic

compression caused [Bowerman] lumbar pain," but that a simulated rotation produced no pain. (*Id.*).

He found that Bowerman's walking, heel to toe, was normal, but that his tandem walking was

"shaky." (*Id.*). He further noted that Bowerman could squat to 90 degrees. (*Id.*). Dr. Barnes's

impression was that the lumbar fusion surgery site was healing. (*Id.*). Based on his examination,

as well as Plaintiff's medical records from as early as October, 2001, Dr. Barnes observed, as

follows:

> I believe that this gentleman is unable to work and probably will be for another six
> months because of his surgery and the fact that his fusion has not taken yet.

(*Id.*).

On July 23, 2003, Dr. James Wright ("Dr. Wright"), a pain specialist, completed a new RFC

for Bowerman, based on records from the twelve months following his surgery. (Tr. at 248-55).

Dr. Wright concluded that Bowerman could lift or carry twenty pounds occasionally; could lift or

carry ten pounds frequently; could stand or walk with normal breaks for about six hours in an eight

---

[16] "Babinski's sign" is "a series of partial responses that are pathognomonic of different degrees of upper motor neuron disease, including (1) absence of an ankle jerk in sciatica; (2) an extensor plantar response, with an extension of the great toe and adduction of the other toes; (3) a more pronounced concentration of phatysma on the unaffected side during blowing or whistling; (4) pronation that occurs when an arm affected by paralysis is placed in supination; and (5) when a  patient in a supine position with arms crossed over the chest attempts to assume a sitting position, the thigh on the affected side flexed, and the heel is raised, while the leg on the unaffected side remains flat." *Id.* at 161.

[17] A "straight leg raising test" ("SLR") is "a physical examination technique to determine abnormality of the sciatic nerve or tightness of the hamstrings.  The presence of sciatica is confirmed by sciatic nerve pain radiating down the limb when the supine person attempts to raise the straightened limb." *Id.* at 1546.

hour work day; could sit for approximately six hours in an eight hour workday with normal breaks; and could either push or pull with "unlimited" capacity, "other than as shown for lift and/or carry." (Tr. at 249).  He also found that, because of his surgery,  Bowerman's postural limitations included occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  (Tr. at 250). Dr. Wright found that Bowerman does not have manipulative, visual, communicative, or environmental limitations.  (Tr. at 251-52).  Finally, he stated that Bowerman's limitations are supported by the evidence of record, but that he did not expect them "to last 12 months," which is the minimum duration required for a finding of disability.  (Tr. at 253).

On August 4, 2005, Bowerman underwent an MRI of his lumbar spine.  (Tr. at 259, 263). The MRI appears to have revealed no new abnormalities.  (*Id*.).

Finally, on March 21, 2006, Dr. Gretha Wik, a specialist in occupational medicine, submitted her medical opinion on Plaintiff's condition on behalf of the State.  (Tr. at 265-72).  In that report, which was drawn entirely from Bowerman's medical records, Dr. Wik wrote that his "impairments established by the medical evidence, combined or separately," do not "meet or equal any impairment described in the Listing of Impairment."  (Tr. at 265).  She reasoned that there was "no evidence of significant back pain or leg pain" and that his "neuro evaluations WNL."  (*Id*.).  She did note that Bowerman had complained of lower back pain and left leg pain since approximately 1999, and that his allegations are supported by the medical evidence.  (Tr. at 266).  In determining Bowerman's limitations, Dr. Wik completed a form titled, "Medical Source Statement of Ability to Do Work-Related Activities (Physical)."  (Tr. at 269-72).  Dr. Wik concluded that Bowerman could lift or carry twenty pounds occasionally; could lift or carry ten pounds frequently; could stand or walk with normal breaks for about six hours in a normal eight hour work day; and could sit for approximately six hours in an eight hour workday, with normal breaks.  (Tr. at 270).  She also stated that his ability

14

to push or pull is limited, in the lower extremities, "as shown for lifting and carrying." (*Id*.).
Further, she found that Bowerman's postural limits included occasional restrictions on balancing,
stooping, kneeling; crouching, or crawling because of a "lumbar fusion 02/03," and that he could
not climb ramps or stairs and ladder, ropes, and scaffolding. (*Id*.). She further stated that Bowerman
did not have any manipulative, visual, communication, or environmental limitations. (Tr. at 271-
72).

### *Educational Background, Work History, and Present Age*

At the time of the hearing, Bowerman was 46 years old, had completed high school, and had
taken some college courses while serving in the United States Army. (Tr. at 277, 290). At the
hearing, Bowerman testified that his work history included a job as a "metal machinist" for the
Houston based company National Oilwell. (Tr. at 278).

### *Subjective Complaints*

In his original application for benefits, Bowerman stated that he stopped working on July 12,
2001, because he "couldn't walk" or lean over and was suffering from pain in his lower back and
left leg. (Tr. at 70). In a report he completed for the SSA, he stated that his pain extended from his
left leg to his groin. He characterized the pain as "aching," "burning," and "stinging." (Tr. at 118-
19). He described his pain as constant and reported that it was exacerbated by standing and walking.
(Tr. at 119). Bowerman also completed a daily activity questionnaire, in which he stated that
because  of his pain, he has difficulty leaning over, sleeping, sitting, standing, walking, lifting,
carrying, bending, kneeling, climbing, reaching, cleaning the house, putting on his shoes and socks,
and driving. (Tr. at 126-27).

At the hearing, Bowerman told the ALJ that he stopped working after an episode in which
his back pain prevented him from getting out of bed for two days. (Tr. at 277-78). He testified that,

after having back surgery eighteen months later, his condition improved, but that he continues to experience "constant" back pain. (Tr. at 278, 284). He also stated that he has "severe numbness at the top of [his] left leg" and a "constant throbbing" sensation in his back. (Tr. at 284). Bowerman testified that he is unable to lift things or to walk while carrying items. (Tr. at 285-86, 295-96). In addition, he testified that he is taking pain pills, muscle relaxants, and anti-anxiety medications. (Tr. at 286, 297).

Bowerman also testified about his activities on an average day. (Tr. at 298). He stated that he does "exercises in bed." (*Id.*). He told the ALJ that he tries to do household chores, such as vacuuming, washing dishes, and cooking. (*Id.*). He testified that when he cooks, he uses a microwave because there is only "a limited time that [he] can stand up and sit down." (*Id.*). Bowerman stated that he can only walk half a block before he has to sit down and rest. (Tr. at 286-87). He explained that his difficulty in walking is because of the problems he has with his left leg and hip. (*Id.*). He further testified that his left leg stings, burns, and is numb. (Tr. at 287). He stated that he can stand for "maybe 20, 30 minutes max[;] then [he has] got to lean on something or sit down." (*Id.*). He elaborated, as follows:

> Usually about 30 minutes, depending on how I adjust myself while I'm sitting. I can't put no weight hardly on my left side. So when I sit, I usually sit more on my right side. Then after awhile it gets to where the right side – I have to stand up.

(*Id.*). Bowerman also testified that he can usually stand "for about 10 or 15 minutes," but that he then has to sit back down" because he gets "chills and little dots" from standing too long. (Tr. at 295). He explained that the chills are in his back and that they make him feel "cold all the time." (Tr. at 298). Bowerman testified that to relieve that chill, he used to stand in front of a warm oven, but that he now uses a heating pad. (Tr. at 298-99).

### Expert Testimony

16

At the hearing, the ALJ also heard testimony from Dr. Gretha Wik.  (Tr. at 300).  From her review of the available medical records, as well as from the hearing testimony, Dr. Wik testified that Bowerman has suffered from chronic lower back pain since approximately 1998.  (*Id*.).  She testified that Bowerman has experienced "occasional pain per the records, at the left posterior thigh."  (*Id*.).  She further testified that, based on the available x-ray reports, Bowerman is suffering from "degenerative dis[k] disease and spondylosis of two levels – L4-5, L5-S1."  (Tr. at 301).  Dr. Wik also elaborated on the neurosurgeon's evaluation, dated April 5, 2002, stating that  Bowerman complained of lower back pain, but that, "neurologically, he was within normal limits."  (Tr. at 302).  She also noted that the straight leg raising test was positive for back pain, but not for leg pain.  (*Id*.).  Dr. Wik noted that Plaintiff had back surgery only after he "failed conservative treatment."  (Tr. at 303).  She testified that, on July 9, 2003, Dr. Barnes found that Bowerman had some "rigidity and some spasticity" in his lumbar spine, but that he was able to walk, heel to toe, and did not experience pain in his leg and hip until his leg was straightened 65 degrees.  (*Id*.).  Dr. Wik also stated that the x-rays showed a "two-level lumbar fusion with internal fixation going from L4 to S," but that they did not reveal a "definite incorporation of the graft bodies."  (Tr. at 303-04).  Dr. Wik noted that Bowerman is missing his right "great toe" from an injury when he was fourteen.  (Tr. at 304-05).  She testified that the missing toe would make it difficult for him to walk, but she found that unpersuasive in terms of his claim of disability because "he had worked for years with that [limitation]."  (Tr. at 305).  Finally, Dr. Wik testified that Bowerman's condition did not meet or equal any of the listed impairments.  (*Id*.).

The ALJ also heard testimony from Karen Nielson, a vocational expert witness.  (Tr. at 306).  From her review of the record, and from Bowerman's testimony, Ms. Nielson described Plaintiff's previous work as a machinist as "medium skilled" labor.  (Tr. at 307).  She testified that

Bowerman's acquired skills would not transfer to other work because they were "job specific."

(*Id*.). The ALJ then posed a series of hypothetical questions to Ms. Nielson. Those questions are

set out below:

> Q      Okay.  Let me give you a hypothetical.  A claimant of this claimant's age,
> education, job experience as testified to, at the light exertional level.  And at that
> level I will give you a few restrictions.  One would be limited twisting, crouching,
> kneeling, climbing of stairs or ramps.  Another would be no crawling, balancing,
> climbing of ladders or scaffolding materials.  Another restriction would be an
> avoidance of hazards such as heights, vibrations, and dangerous machinery
> operation.  With those three restrictions in mind, would we have any jobs that such
> a claimant could perform?

> A      Yes.  At the light unskilled level?

> Q      Light skilled or semi-skilled.

> A      Unskilled.  Because he would go from – he doesn't have transferable skills.
> At the light unskilled level, there would be jobs such as a final inspector.  Light,
> unskilled.  Laminator II.  Light, unskilled.  And a file assembler.  Light, unskilled.
> They all have sit/stand options.

> Q      Okay.  (INAUDIBLE) my example then.  A sit/stand option.  They all have
> sit/stand options and they are all light and unskilled.

> A      There is an [sic] excess of 1,000 in Harris County and the four surrounding
> counties.  And times ten nationwide.

> Q      All right.  And your testimony is not in conflict with either the Dictionary of
> Occupational Titles or the Selected Characteristics of Occupations?

> A      No.  It's taken from the Dictionary of Occupational Titles.

> Q      Okay.  I'm going to ask you one other question.  Let's reduce this
> hypothetical claimant's RFC to sedentary.  Giving me all the same restrictions as we
> just had in the past example, what jobs do we have there?

> A      There would be jobs such as a sorter, which is sedentary, unskilled.  There
> are 900 in Harris County and the four surrounding counties, times ten nationwide.
> Laminator I, which is sedentary, unskilled.  1,000-plus in Harris County and the four
> surrounding counties, times ten nationwide.  And an assembler, which is sedentary,
> unskilled.  1,000-plus in the Harris County and four surrounding counties, times ten
> nationwide.

> Q      Okay.  And once again, your testimony is not in conflict with the DOT or the

SCO?

A     No.  They're coming from the DOT.

(Tr. at 307-09).   Plaintiff's representative then questioned Ms. Nielson regarding the ALJ's

hypothetical question, adding the following conditions:

> Q     A hypothetical claimant the same age, education, who would need to rest four or five times a day for 20 to 30 minutes.  Would there be any jobs available defined as light, unskilled in the national economy?
>
> A     No.
>
> Q     Would there be light, unskilled jobs?
>
> A     There would be no light or sedentary if you have to take unscheduled work breaks throughout the normal day in excess to the 15-minute breaks in the morning and afternoon and a half hour for lunch.  That eliminates competitive work.

(*Id.*).

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence.  From his review of

the record, he determined that Bowerman suffers from severe "lumbar dis[k] disease."  (Tr. at 18).

However, he found that Bowerman's impairment or combination of impairments does not meet or

medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*).

Next, the ALJ found that Bowerman is incapable of performing his past relevant work and that his

job skills are not transferable.  (Tr. at 20-21).   He determined, however, that Plaintiff had the

residual functional capacity for the following:

> light work with a sit/stand option and limited stooping, twisting, crouching, kneeling, and climbing or stairs or ramps, no crawling, balancing, or climbing of ladders or scaffolds, and avoidance of hazards such as heights, vibration, and dangerous machinery.

(Tr. at 18-19).  He then found that there is a significant number of such jobs in the local, regional,

and national economy, including work as a "final inspector," a "laminator II," and a "final

assembler." (*Id.*).  Ultimately, he concluded that Bowerman was not under a disability, as defined

by the Act, through the date of the hearing.  (Tr. at 22).  That denial prompted Bowerman's request

for judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a

determination of whether it is supported by substantial evidence, and whether the ALJ applied the

proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing

*Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the

court.  *See id.*  A finding of "no substantial evidence" is proper only if there are no credible medical

findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44

(quoting *Hames*, 707 F.2d at 164).

Plaintiff argues that the ALJ erred, at step 3 of his analysis, when he found that he did not

meet or equal an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1.  (Plaintiff's Motion

at 6).  Although it is unclear, Bowerman appears to attribute this alleged error to the ALJ's failure

to give the correct weight to the opinions of his treating physicians, as well as to his belief that Dr.

Wik did not consider medical records from the relevant time period.  (*Id.*; Plaintiff's Response at

2-3).  To assess a claimant's argument for disability during the third step of the analysis, the medical

evidence is compared to the list of impairments "presumed severe enough to preclude any gainful

work."  *Sullivan v. Zebly*, 493 U.S. 521, 525 (1990).  If a claimant is not working and his

impairments meet or equal a listed impairment, he is found to be disabled and to qualify for benefits

without further inquiry.  *See id.; see also* 20 C.F.R. § 416.920(d).  These "Listings" describe the

numerous impairments, illnesses, and abnormalities "which are categorized by body system." *Zelby,*

493 U.S. at 529-30.  The claimant, however, must demonstrate that his impairment meets a Listing,

and he "must meet all of the specified medical criteria[;]" each Listing is defined and includes

"medical signs, symptoms, or laboratory test results."  *Id.* at 530.  A claimant does not meet a

20

specific SSA listing if only some of those criteria are manifested.  *See id.*; *see also* SSR 83-19, Dep't

of Health and Human Servs. Ruling 90 (Jan. 1983) ("An impairment 'meets' a listed condition only

when it manifests the specific findings described in the set of medical criteria for that listed

impairment.").  However, even if a claimant does not meet the requirements of a Listing, he may

nevertheless be found to have an impairment that is "medically equivalent" to a listed impairment

if the medical findings in the record are at least equal in severity and duration to the findings for a

listed impairment.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(b); *Zebly*, 493 U.S. at 531.  This

"equivalence" must be based on medical findings only, and those findings must be supported by

medically acceptable clinical and laboratory diagnostic techniques.  *See id.*

In this case, Plaintiff alleges that his condition meets the SSA Listing, 1.04, which provides,

as follows:

> **1.04 Disorders of the spine** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative dis[k] disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic non-radicular pan and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A-C.  Here, there is no dispute that Bowerman suffers

from an impairment of the spine, specifically in the form of degenerative disk disease.  (Tr. at 18, 154, 183, 189, 192).  Bowerman's medical records show that, as early as December 18, 2000, he has suffered from that condition.  (Tr. at 154, 263).  There is further no dispute that degenerative disk disease is included as a qualifying disorder in Listing 1.04.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A-C.  However, it does not appear that Bowerman meets any of the other requirements of the Listing.  The record shows, for instance, that, on July 26, 2001, the MRI requested by Dr. Patel revealed type I changes at the end-plates of L5 and S1, disk desiccation and disk space narrowing at L5-S1, but did not show any disk herniation, foraminal narrowing, or canal stenosis.  (Tr. at 150). Later, on September 26, 2001, Dr. Pardo diagnosed Bowerman as suffering from left L4 radiculopathy, but he did not report that he had found actual compression of a nerve root.  (Tr. at 209).  Further, on October 30, 2002, a Post Discographic CT showed no "nerve root impingement." (Tr. at 193).  Dr. Pakzaban, Plaintiff's own doctor, agreed with that impression.  (Tr. at 187).  In short, there is no evidence that Bowerman suffers from a nerve root compression, as required by Subsection A.[18]  Indeed, the evidence shows that Bowerman has experienced some or all or some of the following: a fairly good to full range of motion in his extremities; good muscle strength and reflexes; no sensory deficits or numbness: no weakness in his feet; no nerve root tension signs; negative straight leg raising tests; a normal gait and balance; and pain only with a lumbar flex greater than 60 degrees.  (*See, e.g.*, Tr. at 189 [Dr. Hanson]; Tr. at 192-93 [Dr. Pakzaban]; Tr. at 196 [Dr. MacDougall, Dr. Fredericks]; Tr. at 246 [Dr. Barnes]).  On this record, there is no evidence that the medical findings meet or equal any listed impairment.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(b).  It is clear, then, that substantial evidence supports the ALJ's conclusion that Plaintiff is not disabled under Listing 1.04A.

Bowerman also alleges, however, that the ALJ erred because he did not give "considerable"

---

[18] Neither party argues that Subsections B and C are relevant to Bowerman's claims.

weight to the opinions of his treating physicians.  (Plaintiff's Motion at 3; Plaintiff's Response at 2-4).  It is well established that an ALJ cannot reject a treating source's opinion without identifying specific, legitimate reasons to do so.  *See Schwartz v. Barnhart*, 70 Fed. Appx. 512 (10th Cir. 2003).  In fact, the Fifth Circuit "has repeatedly held that ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability." *Loza*, 219 F.3d at 395; *see Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237.  It is equally well settled that an ALJ must evaluate every medical opinion that is received on a claimant's behalf, and that he cannot reject the opinion of a treating physician without "good cause" to do so.  *See* 20 C.F.R. § 404.1527(d); *Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 455-56.  "Good cause" may exist when the treating physician's statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence."  *Myers*, 238 F.3d at 62l; *see Greenspan*, 38 F.3d at 237; *see also Newton*, 209 F.3d at 456.  But Fifth Circuit precedent is clear that:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  *Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.*  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

*Id.* (quoting SSR 96-2p) (emphasis in original).  For that reason, a claimant is entitled to a remand if the ALJ rejects, or gives little weight to, a treating doctor's opinion without considering each of the factors set out in the Social Security regulations.[19]  *See Myers*, 238 F.3d at 621; *Newton*, 209

---

[19] Those factors are as follows:
   (1) the physician's length of treatment of the claimant;
   (2) the physician's frequency of examination;
   (3) the nature and extent of the treatment relationship;

F.3d at 456. Conflicts in the evidence, however, are for the Commissioner to resolve. *See Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993) (citing *Selders v. Sec'y of Health & Human Servs.*, 914 F.2d 614, 617 (5th Cir. 1990)).

In his decision, the ALJ did not attribute less weight to treating physicians or specialists. Instead, he commented that he accepted the medical expert witness's "thorough examination of medical evidence and opinion as consistent with the record as a whole." (Tr. at 20). And, as noted, Bowerman's treating physicians did not reach any conclusions that contradict Dr. Wik's opinion. Further, the ALJ's decision is consistent with the opinions from two state agency medical consultants, as well as Dr. Barnes's. (Tr. at 20, 210-17, 245-47). Here, there can be little doubt that the fully developed record and the medical expert's opinion are consistent with the findings of Bowerman's treating physicians. Further, the ALJ is not always required to give a "point-by-point" analysis. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). And, even if the ALJ should have specifically addressed the treating physicians' findings, Bowerman's claim cannot succeed unless he shows that he was prejudiced by the failure to do so. *See Hall*, 660 F.2d at 119. It is well settled that, if an agency "violate[s] its rules and prejudice result[s], the proceedings are tainted and any actions resulting from the proceeding cannot stand." *Id*. In a social security benefits case, an individual establishes prejudice by showing that, absent the violation, a different result might have been reached. *See Ripley*, 67 F.3d at 557. Here, there is simply no evidence that might compel the ALJ, on remand, to find that Bowerman is, in fact, disabled, as defined by the Act. For that reason, Bowerman has not demonstrated that he has been prejudiced by the ALJ's actions or omissions. *See id*.

---

(4) the support of the physician's opinion afforded by the medical evidence of record;
(5) the consistency of opinion with the record as a whole; and
(6) the specialization of the treating physician.

*Newton*, 209 F.3d at 456; *see Myers*, 238 F.3d at 621; 20 C.F.R. § 404.1527(d)(2)-(6).

Next, Bowerman attacks Dr. Wik's opinion, claiming that she did not consider any medical records that are dated before June 24, 2005.  (Plaintiff's Motion at 6).  He complains that the expert witness considered only his medical history from the date he underwent back surgery.  (*Id.*).  However, it appears that Dr. Wik reviewed the record as a whole, and then gave her opinion on his limitations based on the evidence from the claimant's own multiple specialists and physicians.  (Tr. at 267, 300-05).  For example, Dr. Wik specifically referenced Bowerman's medical history from as early as 1998, and she gave detailed testimony regarding that history, summarizing the findings of each doctor who had examined him.[20]  (Tr. at 267, 300-05).  Further, as earlier noted, the ALJ's decision is supported by the evidence, as a whole, so that any defect in Dr. Wik's opinion does not require a reversal of his decision.  In sum, the ALJ's decision was based on the entirety of the record, including the medical evidence on Bowerman's back problems prior to the alleged onset of his disability.  (Tr. at 267, 300-05).

Finally, Plaintiff contends that it is inappropriate for the Commissioner and, presumably, this court, to consider evidence that the ALJ did not specifically reference in his decision, even if that evidence was before the ALJ at the time of the decision.  (Plaintiff's Response at 2).  However, Plaintiff does not identify which evidence the Commissioner is allegedly relying on "post hoc," nor does he demonstrate how this "post hoc" rationalization would change the decision.  It is well settled that, in administrative proceedings, procedural perfection is not required, and a court "will not vacate a judgment unless the substantial rights of a party have been affected."  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).  Here, it is abundantly clear that the record, as a whole, supports the ALJ's decision, so that any imperfection in his procedures cannot have affected Bowerman's substantial rights.  *See id*.  This argument is without merit.

---

[20]  The record also shows that Dr. Wik waited to make her final conclusions until the record was further developed.  (Tr. at 265).

In this case, then, the record and the law require the court to affirm the Commissioner's decision.  For that reason, it is RECOMMENDED that Plaintiff's motion for summary judgment be DENIED, and that Defendant's motion for summary judgment be GRANTED.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**, and that Plaintiff's Motion for Summary Judgment be **DENIED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have ten business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)©, General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 7th day of August, 2008.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**